# IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

JUAN MENDEZ, RENE VARGAS,  )
FRANK ORTIZ, REYNALDO  )
RODRIQUEZ, and JAMIE GARCIA,  )
      )
      Plaintiffs  )
      v.  )      CIVIL NO. 02-0169
      )
HOVENSA, L.L.C.,  )
      )
      Defendants.  )
_____)

## MEMORANDUM OPINION

Finch, J.

THIS MATTER comes before the Court on Defendant HOVENSA, L.L.C.'s Motions to Exclude the Testimony of Plaintiffs' Proffered Experts Robert Buynak. M.D. and Bruce Bernard, PhD.  Hovensa seeks exclusion of such expert trial testimony on the grounds that Dr. Buynak is not qualified to give an opinion in this matter, that the methodologies utilized by both proposed experts are unreliable, and that neither of the proposed expert opinions would be helpful to the jury.  A hearing was held on such motions on January 15, 2008.

## I.      Background

This case involves five Plaintiffs who were employed at the Hovensa oil refinery.  On the morning or early afternoon of June 25, 2002, Plaintiffs developed vomiting, nausea, dizziness, abdominal cramps, diarrhea and chills. They were taken to the medical area of the refinery and then to the hospital's emergency room.  In the emergency room, Plaintiffs were diagnosed with acute infectious gastroenteritis.

Hovensa supplies water to refinery workers in coolers that are distributed throughout the

refinery.  Shortly after Plaintiffs and other workers became sick, Hovensa arranged for the collection of the coolers.  Four of the coolers had an abnormal odor.  Limited testing was performed on some of the water that was collected.  The results of that testing did not show contamination.  However, the water in the coolers from which Plaintiffs had drunk was not tested.  Thus, the test evidence does not conclusively prove or disprove that the source of Plaintiffs' symptoms was the water supplied by Hovensa.

Plaintiffs called upon Dr. Buynak and Dr. Bernard to form an opinion as to the genesis of Plaintiffs' illnesses.  Dr. Buynak and Dr. Bernard testified at the January 15th hearing.  Hovensa introduced the testimony of William George, PhD, in support of its motions to exclude.  The testimony of these three witnesses is summarized in Part II.

## II.     Summary of Testimony

### A.     Robert Buynak, M.D.

Dr. Buynak is board certified in general internal medicine.  He received his medical degree from Harvard University in 1995 and served a three-year residency at the Mayo Clinic in Rochester, Minnesota.  At the Mayo Clinic, he participated in the care of infectious disease patients sent from all over the world.  He has been honored for his achievements in general internal medicine by a fellowship award.

Dr. Buynak presently has a clinical practice in which he generally diagnoses several cases of gastroenteritis a week.  In treating the gastroenteritis, he attempts to determine causation, i.e. to identify positive agents and sources.  On at least five occasions, Dr. Buynak has assisted the Indiana health department in investigating sources that have caused multiple cases of acute

gastroenteritis. He was instrumental in solving the identity of a source of food poisoning in a seafood restaurant in Indiana. Dr. Buynak has been qualified to testify in general internal medicine in about ten cases.

Dr. Buynak testified that he performed a differential diagnosis in reaching his opinion in this case.[1] He met, interviewed, and examined seven individuals who had become ill on June 25, 2002, including the five Plaintiffs. He obtained a detailed history concerning their consumption of food and water. He also reviewed their medical records, including the records of their emergency room visits related to this case. Finally, he read interrogatory responses. Dr. Buynak used all of this data in reaching his diagnosis.

First, Dr. Buynak formed a medical diagnosis of the five Plaintiffs. He determined that Plaintiffs were suffering from acute gastroenteritis and that some were continuing to suffer from chronic gastroenteritis, set off by the acute gastroenteritis. Dr. Buynak then attempted to find a common source that could have caused Plaintiffs to simultaneously exhibit symptoms of gastroenteritis.

From his clinical knowledge of gastroenteritis, Dr. Buynak determined that the gastroenteritis was likely caused by ingestion. He then sought to identify a common source of consumption. He considered food and liquids, including water and alcohol, focusing on shared sources.

Dr. Buynak readily ruled out alcohol because even if any of the Plaintiffs had a tendency

---

[1] Differential diagnosis is "the process of determining which of two or more diseases with similar symptoms and signs the patient is suffering from, by means of comparing the various competing diagnostic hypotheses with the clinical findings." Mary Sue Henifin, et al., "Reference Guide on Medical Testimony," in Federal Judicial Center's Reference Manual on Scientific Evidence, at 481 (2d ed. 2000).

to abuse alcohol, it would be impossible for all of them to have the exact same onset of symptoms based on alcohol abuse.  There was no food source that Dr. Buynak could identify that had been consumed by Plaintiffs as well as others who had gotten sick on June 25, 2002. Although, according to Dr. Buynak, the adverse effects of eating a contaminated food source may not manifest themselves until up to 36 hours later, Dr. Buynak only considered the foods Plaintiffs ate the morning of June 25, 2002.  There was no reference in the material Dr. Buynak reviewed or in the interviews he conducted with Plaintiffs to foods eaten other than on the morning of the occurrence.  Dr. Buynak concluded that the only common source was the water-filled coolers.  Everyone who got sick had drunk water from such coolers before feeling ill.

Dr. Buynak intends to opine at trial that the most probable cause of Plaintiffs' intestinal problems was the water supply.  Because he made his diagnosis on clinical grounds based on well-documented symptoms, he states that the lack of water test results to support his diagnosis does not affect his opinion.  Dr. Buynak has not performed any studies concerning agents in food and water that can cause gastroenteritis, but he has read such studies.

    B.    <u>Bruce Bernard, PhD</u>

Dr. Bernard was retained as a consulting toxicologist. His background in toxicology includes a PhD in Pharmacology and Toxicology.  He has taught as a professor in pharmacology and toxicology and has been employed as a senior toxicologist in a pharmaceutical firm.

Dr. Bernard formed three hypotheses as to what caused the gastroenteritis.  The first was that the sickness was caused by alcohol abuse.  The only evidence of alcohol use was that one of the workers who had gotten sick had been convicted of driving while intoxicated 8 years before

the incident.  There were no tests performed on Plaintiffs to determine whether or not alcohol

was a causative factor.  Even without such test results, according to Dr. Bernard, because of the

number of people who got sick at the same time, it was highly unlikely that alcohol was the

causative agent.  So he eliminated alcohol as an alternative cause.

Dr. Bernard's second hypotheses was that food could have caused the illnesses.  He

attempted to identify the culprit food source.  Burritos were sold within the refinery the morning

of the outbreak.  However, about half the people who got sick did not eat a burrito.  If a food

source were the cause of the sickness, and not everyone who got sick had eaten the contaminated

food, then the only way that those who had not eaten the bad food could have been sickened

would have been from cross-contamination from those who had eaten it.  Cross-contamination

can occur through kissing and in some cases through hand-shaking.  Dr. Bernard considered that

there was only a *de minimis* likelihood that those who had not eaten the contaminated food could

have contracted the illness from those who had and developed full-blown symptoms within a

matter of hours.  Thus, Dr. Bernard discarded the hypothesis that burritos caused Plaintiffs'

illnesses.

The third hypotheses was that the water Plaintiffs had drunk was contaminated.  This was

the only common source that Dr. Bernard could not eliminate; everyone who had gotten sick had

drunk the water.

That is not to say that everyone who drank the water got sick.   But Dr. Bernard did not

eliminate this alternative, just because many people did not get sick.  Dr. Bernard recognized that

people have different susceptibilities.  When exposed to the same contaminant, some people will

get sick, while others will have a stronger immune system and will not get sick.  In this case,

because of the large number of people who got ill, Dr. Bernard said, it is reasonable to infer that anyone who drank the water had a high likelihood of getting ill.  Dr. Bernard's opinion is not swayed even though relatively few people got sick because he takes into account that only a few coolers may have been contaminated.    For Dr. Bernard, the overriding factor is that the only common source of ingestion is the water.  This leads him to conclude that the water caused Plaintiffs' illnesses, notwithstanding that some who drank the water were unaffected.

Other indicators that Dr. Bernard views as pointing to the water was the suddenness, intensity and uniformity of the timing of Plaintiffs' symptoms. These factors indicate recent exposure.  The longer the latency, the more variability around the onset.  According to Dr. Bernard, when the exposure is potent, to the extent of causing hospitalization, it will occur fairly close after consumption.

C.    William George, PhD

Dr. George is a pharmacologist and toxicologist.  He reviewed Dr. Buynak's and Dr. Bernard's methodology as discussed in their depositions, reports and in-court testimony.  As a toxicologist, he does not challenge Dr. Buynak's testimony concerning acute gastroenteritis.  He also agrees that the gastroenteritis could have resulted from ingestion of contaminated water or from food poisoning. However, he submits that neither Dr. Buynak nor Dr. Bernard used the proper methodology in identifying the cause of the gastroenteritis.

Dr. George considers that differential diagnosis is the appropriate methodology.  He contends that this methodology was not properly applied by either of Plaintiffs' proposed expert witnesses.  According to Dr. George, neither expert attempted to conclusively determine the

pathway of delivery.   Nor did they consider other potential causes, which he referred to as confounding factors, such as preexisting health problems of those who experienced the gastroenteritis, and the large number of people who consumed water at the refinery on the day in question without getting sick.  Dr. George concedes that alcohol is not a confounding factor in this case.

Dr. George criticizes Dr. Buynak for not determining where in the refinery each Plaintiff consumed water, for not ascertaining the foods Plaintiffs ate over the 36-hour period before experiencing symptoms of gastroenteritis, and for not addressing the different lag times between drinking water and getting sick.

As to lag time, at least one person reported getting sick within minutes of drinking the water, while others were not ill until several hours after drinking the water.  Because the onset of gastroenteritis, according to Dr. George, does not generally occur within minutes of ingesting a contaminated substance, this varying lag time should have alerted Plaintiffs' experts to suspect a food or liquid consumed up to 36 hours before the symptoms appeared.

According to Dr. George, Dr. Buynak and Dr. Bernard jumped to the conclusion that it was the water without exploration of alternate pathways, such as foods eaten within a 36-hour period.  Dr. George suggests that there may have been multiple contaminated food sources. Finally, Dr. George accuses Dr. Buynak and Dr. Bernard of forming their opinions hastily, without resolving the implications of the negative water tests.

## III.    Discussion

Hovensa submits that the expert testimony of Dr. Buynak and Dr. Bernard is inadmissible

because it does not meet the standard for admissibility under Rule 702 of the Federal Rules of

Evidence.  Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact
> to understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise.

> The Court serves a gatekeeping role:

> [T]he trial judge must determine at the outset . . . whether the expert is proposing
> to testify to (1) scientific knowledge that (2) will assist the trier of fact to
> understand or determine a fact in issue. This entails a preliminary assessment of
> whether the reasoning or methodology underlying the testimony is scientifically
> valid and of whether that reasoning or methodology properly can be applied to the
> facts in issue.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993) (footnotes omitted); see

Fed. R. Evid. 104(a) (requiring that the court decide preliminary questions of admissibility).  The

proponent must satisfy this burden "by a preponderance of proof."  Id. at 593, n.10.

The Rule "embodies three distinct substantive restrictions on the admission of expert

testimony: qualifications, reliability, and fit."  Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir.

2000).  The Court will determine whether the Plaintiffs' proffered expert testimony falls within

these restrictions.


A.      Qualifications

Hovensa does not question Dr. Bernard's qualifications.   However, Hovensa challenges

whether Dr. Buynak is qualified to opine that Plaintiffs suffered from acute gastroenteritis, that

some Plaintiffs continue to suffer from chronic gastroenteritis, and that the water supply caused

Plaintiffs' gastroenteritis.

Dr. Buynak, who is Board Certified in General Internal Medicine and has treated hundreds of cases of gastroenteritis, is inexorably qualified to diagnose Plaintiffs' illness as having experienced acute gastroenteritis. Even defense expert, Dr. George, does not question Dr. Buynak's expertise with regard to reaching this medical opinion. Hovensa does challenge Dr. Buynak's qualification to diagnosis Plaintiffs as continuing to suffer from chronic gastroenteritis stemming from the same incident. The Court considers Dr. Buynak just as qualified to testify concerning a diagnosis of chronic gastroenteritis as acute gastroenteritis. That acute gastroenteritis can be a precursor to chronic gastroenteritis is also a medical opinion well within Dr. Buynak's field of expertise.

"The ability to diagnose medical conditions is not remotely the same, however, as the ability to deduce, delineate, and describe, in a scientifically reliable manner, the causes of those medical conditions." Wynacht v. Beckman Instruments, Inc., 113 F. Supp.2d 1205, 1209 (E.D. Tenn. 2000); see also Morin v. United States, 2005 WL 6059410, at *5 (D. Nev. Jul. 15, 2005) (distinguishing expertise to diagnose and treat disease from competency "to assess its genesis to a reasonable degree of scientific certainty"). For a witness to be qualified to testify as an expert, the witness must have "specialized knowledge" regarding the area of testimony. Elcock, 233 F.3d at 741. The basis of this  specialized knowledge may be practical experience. Id.  This specialized knowledge requirement is interpreted liberally. Id.  Indeed, the Third Circuit has "eschewed imposing overly rigorous requirements of expertise." In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 741 (3d Cir. 1994).

The branch of science relevant to Dr. Buynak's testimony that some contaminant in the water supply caused Plaintiffs' illnesses is toxicology. See Mancuso v. Consolidated Edison Co.

9

of New York, Inc., 967 F. Supp. 1437, 1445 (S.D.N.Y. 1997).  Thus, to qualify to offer an

opinion as to the causation of Plaintiffs' gastroenteritis, Dr. Buynak must, at a minimum, possess

some specialized knowledge about toxicology.  Everett v. Georgia-Pacific Corp., 949 F. Supp.

856, 857-58 (S.D. Ga. 1996).

Dr. Buynak does not have any particular training in toxicology.  He is not certified in

medical toxicology by the American Board of Medical Toxicology, nor is he a member of the

Society of Toxicology.  See Bernard D. Golstein & Mary Sue Henifen, "Reference Guide on

Toxicology," in Federal Judiciary Center's Reference Manual on Scientific Evidence, at 415-417

(2d Ed. 2000).  Dr. Buynak has not written any peer-reviewed publications on toxicology, or

received research grants related to toxicology.  Id. at 418.  However, Dr. Buynak does have

relevant experience in toxicology.  On occasions of outbreaks of multiple cases of gastroenteritis,

he has been called upon to seek and identify the cause, and has successfully done so.  This is

exactly what Dr. Buynak proposes to do in this case.

Dr. Buynak's qualifications to give an opinion on the causation of Plaintiffs'

gastroenteritis could be more extensive.  However, because the Court is directed to be liberal in

assessing an expert's qualification, the Court finds that Dr. Buynak qualifies as an expert not

only to opine regarding his diagnoses of acute and chronic gastroenteritis, but also as to the

causation of the gastroenteritis.  See Leathers v. Pfizer, Inc., 233 F.R.D. 687, 694 (N.D. Ga.

2006) (following principle of liberality in finding clinical practitioner who was not a toxicologist,

was qualified to testify as to general causation).  Dr. Buynak's level of expertise goes to

credibility and weight, not to admissibility.  Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 781-

82 (3d Cir. 1996) (if liberal minimum qualifications are met, level of expertise goes to credibility

and weight, not admissibility); <u>see also</u> <u>Kannankeril v. Terminix Intern., Inc.</u>, 128 F.3d 802, 809

(3d Cir. 1997) (admonishing trial judge to "be careful not to mistake credibility questions for

admissibility questions").

      B.    <u>Reliability</u>

Hovensa seeks the exclusion of the opinions of Dr. Buynak and Dr. Bernard concerning

the causation of Plaintiffs' gastroenteritis as unreliable.  Indeed, whether the conclusions of these

proposed experts as to causation is admissible under <u>Daubert</u> and its progeny is "the heart of the

matter."  <u>Winnicki v. Bennigan's</u>, 2006 WL 319298, at *5 (D.N.J Feb. 9, 2006).

"An expert's opinion is reliable if it is based on the methods and procedures of science

rather than on subjective belief or unsupported speculation; the expert must have good grounds

for his or her belief." <u>Elcock</u>, 233 F.3d at 745 (quotations omitted).  "Where direct evidence of

the precise level of toxic exposure is limited, courts have looked favorably on causation

testimony that is primarily based on differential diagnosis, a scientific analysis which entails the

weighing of relevant evidence, listing all likely causes of the patient's observed symptoms or

injury, then eliminating all but one cause."  <u>Plourde v. Gladstone</u>, 190 F. Supp.2d 708, 722

(D.Vt. 2002); <u>see also</u> <u>Kannankeril</u>, 128 F.3d at 807 (noting that "differential diagnosis" is

recognized "as a technique that involves assessing causation with respect to a particular

individual").  In this case, as both plaintiff and defense experts acknowledge, "differential

diagnosis is an appropriate – if not necessary – scientific methodology in reaching an opinion on

causation."  <u>Plourde</u>, 190 F. Supp.2d at 722.

Although Hovensa agrees that the appropriate methodology to employ to determine

11

causation of Plaintiffs' illnesses is a differential diagnosis, it contests whether Dr. Buynak and

Dr. Bernard applied this methodology properly.  "The elements of a differential diagnosis may

consist of the performance of physical examinations, the taking of medical histories, and the

review of clinical tests, including laboratory tests." Kannankeril, 128 F.3d at 807.  Even when

some of these techniques are not used and certain of these types of information are not available,

the differential diagnosis may be reliable.  Id.

In identifying causation, all of the potential causes of a plaintiff's symptoms must be

considered, and then alternative causes eliminated based upon physical examination, clinical

tests, and a thorough case history.  Mancuso v. Consolidated Edison Co. of New York, Inc., 967

F. Supp. 1437, 1446 (S.D.N.Y 1997).  However, "[a] medical expert's causation conclusion

should not be excluded because he or she has failed to rule out *every* possible alternative cause of

a plaintiff's illness; [only] *[o]bvious* alternative causes need to be ruled out." Heller v. Shaw

Industries, Inc., 167 F.3d 146, 156 (3d Cir. 1999).

Hovensa urges the Court to find both the expert opinions of Dr. Buynak and Dr. Bernard

unreliable because such experts failed to eliminate all obvious potential alternative causes of the

gastroenteritis.  In particular, Hovensa contends that neither the food that was eaten a day to a

day and a half prior to the onset of symptoms nor alcohol were considered as potential alternative

causes of gastroenteritis.

Plaintiffs' symptoms are consistent with ingestion of a contaminated source.  Dr. Buynak

states that as many as 36 hours can pass following the consumption of contaminated food or

liquid before the initial symptoms of acute gastroenteritis will manifest themselves.  According

to Dr. Buynak, a contaminated common food source eaten the day prior to the onset of Plaintiffs'

12

symptoms could have caused their gastroenteritis. Chronic misuse of alcohol can cause the same symptoms as consumption of a toxic source.

Dr. Buynak did not receive any information except as to the foods and liquids consumed by Plaintiffs the day that they got sick. If Plaintiffs had eaten a common food or drunk a common liquid the day before they were taken to the emergency room, such common source would be an obvious potential alternative cause of the gastroenteritis. If Dr. Buynak failed to eliminate this common source, he would not have performed a proper differential diagnosis.

However, as Dr. Buynak explained in his deposition, in his report, and at the hearing, no common source consumed the day before Plaintiffs' symptoms appeared was identified. The only common source was the water Plaintiffs drank on the same day that they became sick.

Dr. Buynak did not consider alcohol to be an obvious alternative cause of the gastroenteritis. He testified that, even if Plaintiffs all had a tendency to abuse alcohol, which is not supported by the evidence, it would be impossible for Plaintiffs to have the exact same onset of symptoms during the same period based on alcohol abuse.

Dr. Bernard was less concerned than Dr. Buynak with identifying foods and liquids consumed the day before the outbreak of gastroenteritis. According to Dr. Bernard, when a number of people become ill at the same time, the causative agent must be highly potent. A contaminant with lesser potency would have had variable latency that would depend on individual susceptibility and dosage. In other words, if the contaminant had a lesser potency, Plaintiffs would not have gotten sick within the same brief period. The simultaneous timing of their sicknesses indicated high potency and short latency. Thus, because of the manner in which the gastroenteritis manifested itself, Dr. Bernard determined that the offending agent must have

been consumed the same day as the Plaintiffs' symptoms appeared.

Dr. Buynak and Dr. Bernard attempted to eliminate all obvious potential alternative causes. They both considered all the foods and liquids that Plaintiffs consumed the day they became ill. Although some Plaintiffs had eaten a common food, Plaintiffs who had not eaten the common food also became sick. The experts found no path by which Plaintiffs who had eaten the common food could have spread their illness to Plaintiffs who had not eaten the common food. Thus, Dr. Buynak and Dr. Bernard eliminated this common food as a potential cause of Plaintiffs' gastroenteritis.

Because there was no data concerning foods and liquids Plaintiffs ingested on the day before getting sick, such foods and liquids could not be considered a common source and were not obvious potential alternative causes of Plaintiffs' illnesses. Finally, Dr. Buynak and Dr. Bernard considered and ruled out alcohol abuse as an alternative cause.

When the process of elimination was complete, the only remaining potential cause was the water that Plaintiffs drank the same day as they experienced vomiting, nausea, diarrhea, and other signs of gastroenteritis. Although the water Plaintiffs drank was stored in separate coolers, the water was drawn from a common water source. Based on their differential diagnoses, Dr. Bernard and Dr. Buynak concluded, since there was no other common source, the water in several of the coolers must have caused Plaintiffs' illnesses.

Dr. George points out that some unidentified common food source, or multiple contaminated food sources, may have been the pathway by which the contamination reached the affected refinery workers. In Winnicki, 2006 WL 319298, at *13, the defense similarly contended that because plaintiff's expert had not considered the meals plaintiff consumed prior

14

to the allegedly contaminated food, he had not evaluated all possible alternative causes of plaintiff's illness, and therefore had not performed a proper differential diagnosis. The court found plaintiff's expert's opinion reliable, not withstanding this failure to consider other meals. Id. Like the expert in Winnicki, in conducting a reliable differential diagnosis, Dr. Buynak and Dr. Bernard were not required to rule out all alternative possible causes of Plaintiffs' illnesses, only the obvious alternative causes. See id.

"[O]nly where a defendant points to a plausible alternative cause and the doctor offers no explanation for why he or she has concluded that was not the sole cause, that doctor's methodology is unreliable." Heller, 167 F.3d at 156. Hovensa has not pointed to any other plausible alternative cause. The most Hovensa has been able to determine is that several Plaintiffs ate the same food that day. Hovensa has not identified a pathway for cross-contamination between those who ate the food and others who did not eat the same food, but nonetheless became ill. Because several Plaintiffs did not eat that food, Plaintiffs' experts' opinion that this food was not the cause of Plaintiffs' gastroenteritis does not lack reliability.

While there may have been some other contaminated liquid or food source that Plaintiffs ingested, Hovensa has not identified it. Although Dr. George states that, with regard to at least one Plaintiff, the illness occurred too quickly after imbibing water for the water to have caused the gastroenteritis, he offers no other explanation for discrediting Plaintiffs' experts' conclusion. See Winnicki, 2006 WL 319298, at *13 (allowing expert testimony notwithstanding defense expert's statement that plaintiff's illness occurred too quickly to be explained by allegedly contaminated food, because defense expert offered no other explanation).

Dr. Buynak and Dr. Bernard engaged in differential diagnoses in a reliable manner. Dr.

Buynak physically examined Plaintiffs, took medical histories, and reviewed hospital records and test results. Dr. Buynak and Dr. Bernard considered obvious alternative causes. Heller, 167 F.3d 146, 156 (3d Cir. 1999). The Court finds that, because they used accepted methodologies in a proper manner, their opinions are reliable. _____

C.    Fit

"Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Daubert, 509 U.S. at 591 (1993) (quoting Fed. R. Evid. 702). This consideration of relevance has been described as one of "fit" or "helpfulness." See id. For an expert's opinion to fit, there must be "a valid scientific connection to the pertinent inquiry." Id. at 591-92.

The standard for the fit factor is not high. United States v. Ford, 481 F.3d 215, 219-220 (3d Cir. 2007). However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). To "fit," the proffered evidence must "*speak clearly and directly to an issue in dispute*" and *"not mislead the jury."* Ford, 481 F.3d at 220, n.6.

Dr. Buynak's opinion that Plaintiffs suffered acute gastroenteritis, continue to suffer chronic gastroenteritis, and that the gastroenteritis resulted from ingestion of a contaminated substance, are beyond the ken of a layperson, relate to an issue in the case, and would not mislead the jury. Dr. Buynak and Dr. Bernard intend to express their opinions concerning the agent that

16

caused Plaintiffs' illnesses.  Certainly, this is an issue in dispute.  The lack of conclusive water tests presents an analytical gap between the data available to these experts and their conclusions. The gap is not too great, however, to preclude the admission of their opinions.  Through reliable methodology, these experts were able to narrow their search for the source of Plaintiffs' illnesses to the water that they consumed the day they got sick.  The expert opinions will help the jury by focusing the jury's attention, as the jury gropes with determinating causation, on the importance of identifying a common source and eliminating obvious alternative sources that were not common to all of those who suffered from the gastroenteritis attack.

## IV.    Conclusion

Plaintiffs have shown, by a preponderance of the evidence, that Dr. Buynak is qualified to give his opinion, that the methodologies employed by Dr. Buynak and Dr. Bernard bear the hallmarks of reliability, and that the opinions fit the principal issues in dispute in this matter and will be helpful to the jury.   In concert with the liberal policy of admissibility, Holbrook, 80 F.3d at 780, the Court denies Hovensa's motions to exclude the proffered testimony.  Of course, "[t]he analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination."  Kannankeril, 128 F.3d at 807.


ENTER:


DATE:        March 17, 2008          _____/s/_____
                                     HONORABLE RAYMOND L. FINCH
                                     DISTRICT JUDGE